Nott, J.,
delivered the opinion of the court:
This case was transmitted to the court by the Committee on War Claims of the House of Eepresentatives. Its subject-matter is quartermaster stores furnished to the Army at Savannah during the war of the rebellion. Concerning such claims the statute conferring jurisdiction expressly provides that “the fact of loyalty shall be a jurisdictional fact,” and that unless the court shall “on a preliminary inquiry find that the person who furnished such supplies or stores, or from whom the same were taken as aforesaid, was loyal to the Government of theUnited States throughout said war, the court shall not have jurisdiction of such cause.” Bowman Act, 1883 (22 Stat.L.,p. 486, § 4.)
It is on this “preliminary inquiry” that the court is now engaged.
The counsel for the claimant has pressed upon the attention of the court the fact tLat in a former action between the same parties (a suit under the Abandoned or Captured Property Act, 1863) the question of the claimant’s loyalty was necessarily involved, and that it was determined in his favor. It is said that the claimant recovered a large sum for cotton taken, and “ in order to arrive at that judgment this court necessarily passed upon the question of loyalty,” and “ the claimant was found loyal by this court.” It is also said that all of the matters which are now relied upon by the defendants as adverse to the claimant’s loyalty “ were before the court in the cotton case, and, notwithstanding, the court found the claimant loyal.”
It is true that the Abandoned and Captured Property Act, 1863 (12 Stat. L., 820) required that the claimant should prove “to the satisfaction ” of .this court that he had never given “ aid or comfort to the rebellion,” and it is likewise true that this court regarded the words of the statute as relating to the fact of aid or comfort, and required proof of the fact of loyalty.
This practice continued until the 29 th day of December, 1871. But on that day the Supreme Court rendered its decision in the *169 case of Klein (7 C. Cls. R., 240; 13 Wallace R., 128), wherein it was held that the pardon or amnesty of the President entitles the disloyal owner of captured property to the proceeds in the Treasury, and enables him to maintain an action therefor m the Court of Claims.
From the date of that decision, a recovery in this court, or a finding of loyalty, meant nothing more than that the party came within the operation of the pardoning power. In Carlisle & Henderson’s Case (16 Wall. R., 149) it was held that resident aliens, though domiciled within the realm of the de faeto government of the Confederate States, owed allegiance to the de jure Government of the United States, and consequently were within the scope of the executive clemency; in Young, assignee of Collie (97 U. S. R., 39), that the amnesty proclamation of the President did not extend to a nonresident alien, and that the fact of his having given aid or comfort to the rebellion was fatal to his claim.
But in the decision relied upon by the present claimant nothing is left to conjecture. Not only was that case decided after the decision of the Supreme Conrt in Klein, but it expressly appears in the report of the case that, “ to establish his standing in this court, the claimant at the trial offered in evidence a warrant of pardon issued to him by the President.”
And the court expressly puts its decision, favorable to the claimant, upon the sole ground that, “ under the decision of the Supreme Court in Klein’s Case, the President’s amnesty proclamation, December 25,1868, entitles all who gave aid or comfort to the rebellion to prosecute their claims in this court, and we are bound by that decision.” (7 C. Cls. R., 443.)
It is, then, manifest, so far as the fact was involved, that the evidence in the former case failed to establish the claimant’s loyalty. It is also manifest that the special pardon failed to establish it, and that the recovery of $72,853.96 rested entirely upon the proclamation of amnesty and the decision of the Supreme Court in Klein.
Apart from the decision of the Supreme Court in Klein’s Case, a pardon is ordinarily deemed in the minds of men to be a badge of guilt and not a certificate of innocence. Moreover, the pardon here was sought, accepted, and used in evidence by the claimant to recover a very large amount. This raises, if not a presumption, at least a suspicion, which he has endeav *170 ored to remove by bis subsequent testimony before tbe South-orn Claims Commission, in wbieli be says:
“ President Johnson proclaimed that all who bad property' over $20,000 should apply for a pardon. I applied and received a pardon; I applied under a misapprehension, for I bad never participated in tbe rebellion; I thought it was necessary to protect my property.”
The proclamation of President Johnson announcing his willingness to pardon deserving members of the excepted classes (the proclamation by which the claimant was misled) provided that “ the following classes of persons” are excepted from its benefits, among which are:
“13. All persons who have voluntarily participated in said re-hellion and the estimated value of whose taxable property is over $20,000.”
These persons form the excepted class within which the claimant placed himself, persons who had “ voluntarily participated in said rebellion,” and the value of whose taxable property exceeded $20,000. To such persons the proclamation fur-thersaid:
“Provided, That special application may be made to the President for pardon by any person belonging to the excepted classes, and such clemency will be liberally extended as may be consistent with the facts of the case and the peace anddig-nity of the United States.”
If the application for a special pardon had been made immediately after this proel amation was promulgated; if it had been based on imperfect newspaper reports and telegraphic dispatches of what the proclamation said; or if it had been made in the throes of anxiety and alarm which tortured Southern communities in the first days that followed the overthrow of the Confederate power, there might be some justification for the “misapprehension ” of which the claimant subsequently testified. But that proclamation was issued on the 29th May, 1865 (13 Stat. L., 758), and the claimant’s pardon was not accepted until the 2d April, 1867. Two years had then elapsed since the fall of Bichmond, nearly two years from the issuing of the proclamation; substantially no trials for treason and no proceedings for confiscation had been instituted by the G-ov-eminent. The proclamation April 2, 1866 (14 Stat. L., 811), *171 for just a year bad declared that the insurrection which had theretofore existed in the State of Georgia was at an end, and the inhabitants of Southern cities had resumed their avocations in the full assurance that they would not be molested in person or property. Why the claimant should have supposed, at that late day, that a pardon “ was necessary to protect his property ” he has not explained. On the contrary, there appears in the record of the former case a very significant sequence of events.
The decision of the Supreme Court in Garland ex parte (4 Wall. R., 333) held that the power of pardon conferred by the Constitution upon the President “extends to every offense known to the law; ” that it may prevent “ penalties and disabilities” from attaching; that it restores the person pardoned “ to all his civil rights,” and “ gives him a new credit and capacity.” This decision, after a protracted argument and careful consideration, was rendered on the 14th January, 1867. On the 18th March following, the pardon was procured; and on the 11th June following, the claimant brought his suit to recover the proceeds of his cotton under the Captured Property Act. That is to say, in January we have the declaration of the Supreme Court that statutory provisions limiting the pardoning powers are unconstitutional; in March the procurement of a pardon for voluntary participation in the rebellion; in June a suit brought in this court to recover the proceeds of captured property.
A pardon which becomes operative restores a man to a condition of innocence so completely that, with regard to penalties and punishments, forfeitures and disabilities, a court can not see that an offense was ever committed (Young for Go,llie, supra); a pardon which does not become operative does not constitute an estoppel, precluding the party from denying the existence of the acts for which the pardon was granted Scott's Case (8 C. Cls. R., 457); but an application for and an express acceptance of a pardon for a designated offense — voluntary participation in a rebellion — are in a greater or less degree an admission that the act for which the pardon was invoked in fact existed. Like other admissions, it may be lessened or intensified by attendant circumstances.
In the present case the circumstances operate to intensify the admission, and, taken in connection with other evidence in *172 the case, lead to the conclusion that the claimant was' not “ loyal to the Government of the United States throughout the said war.”
In this class of cases it is not a question whether the party has or has not been restored to a condition of legal innocence. What the court is here engaged in doing is'finding facts by judicial process for the assistance of Congress. The first fact to be found, according to the jurisdictional authority (the statute), is the fact of the claimant’s loyalty through a defined period. If that can not be found, no other may be.
The order of the court is, that the case be dismissed for want of jurisdiction and that it be so reported to Congress.